UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY AND CHERYL SYKES,

        Plaintiffs,                              No. 13-CV-12087

                                                  HON. MARK A. GOLDSMITH

vs.

BANK OF AMERICA CORPORATION,
et al.,

        Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (Dkt. 24)

## I. INTRODUCTION

This foreclosure case is before the Court on Defendants Bank of America Corporation's and Bank of America, N.A.'s motion to dismiss Plaintiffs Gregory and Cheryl Sykes's First Amended Complaint (Dkt. 24). Plaintiffs allege that, after a long period of dilatory tactics, Defendants promised them a loan modification under the federal government's Home Affordable Modification Program ("HAMP"), and then, after Plaintiffs complied with their obligations to obtain the modification, Defendants offered a more-expensive "in-house" modification instead. First Am. Compl. (Dkt. 22). Because the Court concludes that Plaintiffs' claims of a promised HAMP modification are belied by the written document at issue, and because Defendants' purported conduct does not rise to the level necessary to support a claim for intentional infliction of emotional distress, the Court grants Defendants' motion to dismiss (Dkt. 24).

1

## II. BACKGROUND

In 2003, Plaintiffs executed a note and mortgage with Countrywide Home Loans, Inc. for the purchase of their home.  Countrywide's assets were subsequently sold and transferred to Defendants.  First Am. Compl. ¶ 11 (Dkt. 22).

In or around October 2010, one of Defendants' employees offered to consider Plaintiffs for a modification of their existing mortgage loan.  Id. at ¶ 12.  The employee purportedly described a loan modification under HAMP as one possible option; Plaintiffs agreed to consider this possibility.  Id. at ¶¶ 13, 15.

While waiting for the modification application to arrive, Plaintiffs received letters from Defendants stating their intention to accelerate the amount due, as well as threatening foreclosure.  Id. at ¶ 16.  Plaintiff Gregory Sykes purportedly suffered a panic attack as a result of the letters.  Id. at ¶¶ 17-18.  However, Plaintiffs allege that Defendants ultimately advised them that the letters were computer generated and should be ignored because Plaintiffs were pursuing a HAMP modification.  Id. at ¶ 19.

Plaintiffs received a purported HAMP modification application package in February or March 2011, and they submitted their application shortly thereafter.  Id. at ¶¶ 23-24.  Over the next few months, Plaintiffs repeatedly contacted Defendants to inquire about the status of their application.  Id. at ¶¶ 25-50.  Plaintiffs allege that Defendants continually asked for the same information, sent new applications to be completed, and transferred them to various representatives.  Id.; see also HAMP application letters, Ex. 1 to Pls. Supp. Br. (Dkt. 35-1) (HAMP application letters sent by Defendants in September 2011, October 2011, November 2011, December 2011).  At one point, Defendants' agent purportedly informed Plaintiffs that

Defendants had "dropped the ball," but Defendants continued to make obtaining a modification difficult thereafter.  First Am. Compl. at ¶ 39; see also id. at ¶¶ 40-50.

Plaintiffs also allege that Defendants sent various foreclosure notices to Plaintiffs during this time.  Mr. Sykes purportedly suffered further panic attacks as a result of these notices.  Id. at ¶¶ 36-38, 49.

According to Plaintiffs, Defendants informed them around March 2012 that a permanent HAMP modification would not be possible due to a "ratio issue."  Id. at ¶ 51.  Plaintiffs were then referred to a housing counselor at New Hope, who advised them to seek an "in-house" modification or re-payment plan from Defendants.  Id. at ¶ 52.  Defendants purportedly agreed to consider Plaintiffs for an "in house re-payment plan."  Id. at ¶ 53.  However, Plaintiffs allege that the information arrived from Defendants after the due date for the first payment, thereby making a timely payment impossible.  Id. at ¶¶ 58-64.

In June 2012, Plaintiffs received a letter from Defendants offering a Trial Period Plan ("TPP").  Id. at ¶¶ 72-74.  Under the terms of this proposal, Plaintiffs were required to make three monthly payments of $965.06 beginning in July 2012.  Id.; see also TPP (Dkt. 32-3).  If the trial payments were timely made, and if Plaintiffs continued to qualify, the TPP stated that Defendants would send Plaintiff a permanent modification, and, if agreed to, Plaintiffs' "mortgage will be permanently modified."  Plaintiffs allege that, via the TPP, Defendants promised a permanent modification under HAMP, but that Defendants ultimately offered a "more expensive 'in house' modification" instead.  First Am. Compl. ¶¶ 73-82.[1]

---

[1] There has been some confusion regarding which document Plaintiffs rely upon for their claim that Defendants promised them a permanent modification under HAMP.  In the governing complaint, Plaintiffs alleged that it was the "approved 'temporary' HAMP loan modification," which they claimed was sent "[o]n or about October 6, 2012."  First Am. Compl. ¶ 72.  Plaintiffs

Plaintiffs bring four claims: (1) breach of contract, for Defendants' failure to offer a permanent HAMP modification, as purportedly promised by the June 2012 TPP; (2) fraud, based on Defendants' purported lack of intent to offer a HAMP modification despite the TPP offer; (3) intentional infliction of emotional distress, based on Defendants' alleged conduct of creating a scheme to avoid offering HAMP modifications; and (4) unjust enrichment, based on Defendants' receipt of funds from the federal government to offer HAMP modifications.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." In evaluating a motion to dismiss pursuant to Rule 12(b)(6), "[c]ourts must construe the complaint in the light most favorable to plaintiff, accept all well-pled factual allegations as true, and determine whether the complaint states a plausible claim for relief." Albrecht v. Treon, 617 F.3d 890, 893 (6th Cir. 2010) (internal brackets, quotation marks, and citations omitted). To survive a motion to dismiss, a complaint must plead specific factual allegations, and not just legal conclusions, in support of each claim. Ashcroft v. Iqbal, 556 U.S. 662, 678-679 (2009). A complaint will be dismissed unless, when all well-pled factual allegations are accepted as true, the complaint states a "plausible claim for relief." Id. at 679.

---

also claimed that this document was attached to the complaint as exhibit 3. Id. at ¶ 74. However, exhibit 3 was the permanent modification Defendants offered in December 2012.

Plaintiffs then attached the June 2012 TPP letter to their response to the motion to dismiss, claiming that was the purported promise for a HAMP modification. Pls. Resp. Br. at 3, 5 ("On June 20, 2012, BoA issued an offer to Plaintiffs. . . . The existence of the TPP offer and acceptance is alleged in the complaint."); Pls. Resp. at 1 ("Plaintiffs' [sic] have attached the TPP contract and the payment coupons to this response"). At oral argument, the Court raised this discrepancy and granted Plaintiffs an opportunity to clarify the correct document they believed formed an agreement for a HAMP modification. Plaintiffs filed a supplemental brief confirming that it is the June 2012 letter at issue. See Pls. Supp. Br. at 2 (Dkt. 35) ("The June 20, 2012 TPP letter and offer is the modification at issue.").

In ruling on a motion to dismiss, the Court may consider the entire complaint, documents incorporated by reference into the complaint and central to the claims, and matters on which a court may take judicial notice.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  "[I]f a factual assertion in the pleadings is inconsistent with a document attached for support, the Court is to accept the facts as stated in the attached document."  Williams v. CitiMortgage, Inc., 498 F. App'x 532, 536 (6th Cir. 2012) (quotation marks and citation omitted).

## IV.  ANALYSIS

### A.  Breach of Contract

Plaintiffs first claim that they entered into a contract with Defendants — the TPP — to modify their mortgage loan pursuant to the HAMP program.  First Am. Compl. ¶ 98.  According to Plaintiffs, "once [they] made their initial 3 trial period payments," Defendants "would issue a permanent modification."  Id. at ¶ 99.  However, Plaintiffs claim that, "[d]espite [their] full and complete performance with the original TPP requirements . . . and the additional requirements imposed by [Defendants], [Defendants] failed and refused to issue a permanent HAMP modification of Plaintiffs' mortgage loan."  Id. at ¶ 103.  In other words, Plaintiffs claim that, through the TPP, Defendants promised to issue a "permanent HAMP loan modification," which was never actually issued.  Id. at ¶ 106 ("BoA's actions constitute a breach of a contract to grant a permanent HAMP loan modification of their mortgage loan.").

Defendants argue that Plaintiffs' claims are barred by the statute of frauds, Mich. Comp. Laws § 566.132(2), because the TPP at issue is not signed by them.  Defs. Br. at 9-12.  Defendants also assert that the breach-of-contract claim cannot stand because they did offer Plaintiffs a permanent modification in December 2012.  Defs. Reply at 1.  The Court need not

5

decide the first issue, because, even if the statute of frauds does not apply, Plaintiffs have not stated a plausible claim for relief based on a breach of the TPP.[2]

Plaintiffs' breach-of-contract claim is based on their belief that, although Defendants offered an "in-house" permanent modification, Defendants promised, but ultimately did not offer, a HAMP modification pursuant to the June 20, 2012 TPP offer.  See First. Am. Compl. ¶¶ 98, 106; Pls. Resp. Br. at 3, 5, 10; Pls. Supp. Br. at 2.  The trouble with Plaintiffs' argument, however, is that the language of the TPP offer undermines their claim.  In the TPP, Defendants informed Plaintiffs that, "[b]ased on a careful review of the information [Plaintiffs] provided, [they] are approved to enter into a conditional Trial Period Plan."  See TPP (Dkt. 32-3).  To accept the offer, Defendants asked Plaintiffs to make three trial period payments of $965.06 in July, August, and September.  Id.  The letter informed Plaintiffs that, "[a]fter [they] make all trial period payments on time, and if [they] continue to meet all of the eligibility requirements of [the] modification program, [their] mortgage will be permanently modified."  Id.

Plaintiffs claim that, because they made all of the required trial period payments, a contract was formed and they were entitled to a HAMP modification pursuant to the TPP.  First. Am. Compl. ¶¶ 98-106.  But Plaintiffs do not point to any language in the TPP promising a loan modification under HAMP; rather, the TPP simply says that Plaintiffs' "mortgage will be permanently modified."  Id.  There is no dispute that Defendants offered Plaintiffs a non-HAMP permanent loan modification in December 2012, and that Plaintiffs rejected it.  See Loan Mod.

---

[2]  To the extent Plaintiffs' breach-of-contract claim is based in any part on alleged oral promises or statements purportedly made by Defendants' agents, this is clearly barred by the statute of frauds, Mich. Comp. Laws § 566.132(2).  See Crown Tech. Park v. D&N Bank, FSB, 619 N.W.2d 66, 72 (Mich. Ct. App. 2000) (holding that the statute of frauds prevents a party "from bringing a claim — no matter its label — against a financial institution to enforce the terms of an oral promise to waive a loan provision"); Price v. Fed. Home Loan Mortg. Corp., No. 12-12012, 2013 WL 980278, at *2 (E.D. Mich. Mar. 13, 2013) (same).

(Dkt. 22-3); Pls. Supp. Br. at 2.   Rather, Plaintiffs' breach-of-contract claim is based on an allegation that the June 2012 TPP required Defendants to offer a <u>HAMP</u> modification.  Plaintiffs cite no language supporting such a claim.

To the contrary, Plaintiffs' allegation that they were guaranteed a HAMP modification by the TPP is undermined by the express language of that document itself.[3]  In the section entitled "What you need to do next," the TPP instructs Plaintiffs that, "It is important that you carefully review the <u>Frequently Asked Questions</u> and <u>Additional Trial Period Plan Information and Legal Notices</u> information attached."   TPP at 1 (cm/ecf page) (Dkt. 32-3).  The last question in the Frequently Asked Questions reads, as follows:

> **Q.  Are there incentives that I may qualify for if I am current with my new payments?**
> No.   Borrower incentive compensation is only available to borrowers who qualified for a permanent modification under Fannie Mae Home Affordable Modification Program (HAMP). <u>You did not qualify for a modification under HAMP.</u>

<u>Id.</u> at 3 (cm/ecf page) (emphasis added).  The language of the June 20, 2012 TPP itself thus clearly informed Plaintiffs that they did not qualify for — and would not be receiving — a modification under HAMP.  Instead, Plaintiffs were promised a loan modification of some form

---

[3]  For this reason, the Court is not persuaded by Plaintiffs' repeat citation to, and reliance upon, the HAMP multidistrict litigation in Massachusetts.  That case concerns TPP offers sent to borrowers that expressly promised a HAMP modification if the trial period payments were completed.  <u>See</u> TPP, Case No. 1:10-md-02193-RZ (D. Mass) (Dkt. 86-10) (showing a document entitled "Home Affordable Modification Trial Period Plan," which states, "If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement"; the footer at the bottom also reads, "Home Affordable Modification Program Trial Period Plan").  This case, on the other hand, involves a promise to permanently modify the loan, but not necessarily under HAMP.  Therefore, the Court disagrees with Plaintiffs that they are "similarly situated to the Plaintiff's [sic] in the HAMP contract litigation."  First Am. Compl. at 2.  The Court also rejects Plaintiffs' arguments that Defendants are "collaterally estopped from denying a valid contract exists between Plaintiffs and [Defendants] as to a HAMP modification," <u>id.</u> at ¶ 10, and that the Court should either stay this case pending a final judgment in the MDL, or transfer it to the District of Massachusetts, Pls. Resp. Br. at 7-8.

upon the conclusion of the trial period.  Thus, when Defendants offered Plaintiffs a permanent

loan modification in December 2012, it fulfilled its end of the alleged contract, even though it

was not a modification under HAMP.[4]

Notably, Plaintiffs' counsel conceded at oral argument that "a lot of this" case is

"contingent upon" Plaintiffs "demonstrat[ing] to the Court that a HAMP offer was made."  Hr'g

Tr. at 14 (Dkt. 36-2).  Plaintiffs have not and cannot make such a demonstration in light of the

---

[4]  Plaintiffs argue that they rejected the December 20, 2012 permanent modification offer
because "the proposed loan was materially different than the modified loan that had already been
agreed to by the TPP."  Pls. Supp. Br. at 2.  As Defendants highlight, however, the TPP was
temporary; indeed, under its terms, if Plaintiffs made all of the trial period payments and met the
other requirements, they would "receive a modification agreement detailing the terms of the
modified loan."  See TPP at 3 (cm/ecf page); see also Defs. Supp. Br. at 4 (Dkt. 36).  The TPP
even goes on to expressly state, "Note: This is only a temporary Trial Period Plan."  TPP at 2
(cm/ecf page).  Therefore, the TPP made clear that it was only temporary, and that, if satisfied,
Defendants would then send a proposed permanent loan modification agreement.  And it is
undisputed that Defendants ultimately sent such an agreement in December 2012.  Pls. Supp. Br.
at 2.

 As for Plaintiffs' contention that the proposed modification was more expensive, the TPP noted
that, in calculating the monthly payment for the proposed modification agreement, "Any
difference between the amount of the trial period payments and your regular home loan
payments will be added to the balance of your loan along with any other past due amounts as
permitted by your loan documents.  While this will increase the total amount that you owe, the
amount of your modified mortgage payment should remain very close if not equal to your trial
plan payment as that is determined based on your total monthly gross income, not your loan
balance."  Id. at 3 (cm/ecf page) (emphasis added).  This is precisely what Defendants offered in
December 2012: a longer pay period (to accommodate the overdue payments and reduced
payment amounts), with a monthly payment approximately $9 less than the amount of the trial
period payments, and approximately $600 less than the amount of the original loan payments.
See Loan Mod. at 2 (cm/ecf page) (Dkt. 35-2); see also Hr'g Tr. at 22-23 (Dkt. 36-2)
(acknowledging the $600 difference).

 In short, Plaintiffs appear to believe that they were entitled to a permanent loan modification
that reduced their monthly payment to the TPP level, but kept the original loan duration, thereby
substantially reducing the amount they had to repay Defendants.  Plaintiffs point to no
documentation showing an entitlement to such a modification; to the contrary, the TPP's express
language refutes such a claim.

documents before the Court that Plaintiffs claim are operative.  Accordingly, the Court dismisses

Plaintiffs' claim for breach of contract.

## B.  Fraud

Plaintiffs' second claim is for fraud.  Plaintiffs claim that Defendants employed "tricks,

schemes, and devices . . . with the intent to defraud Plaintiffs as [Defendants] had no intention of

granting Plaintiffs a permanent HAMP modification."  First. Am. Compl. ¶ 113.  Plaintiffs

summarize their fraud claim in their response to the motion to dismiss, as follows:

> In sum, all of the elements of a fraud claim are met: 1). BoA
> represented it would grant a permanent modification if Plaintiffs'
> [sic] performed their TPP; 2). That representation was false – BoA
> had no intent to grant the HAMP modification and in fact refused
> to do so; 3). The representation was made by BoA with the intent
> the Plaintiffs' [sic] rely on it – BoA did and Plaintiffs' [sic] did as
> they made the payments and BoA has admitted it; 4). Plaintiffs'
> [sic] relied on the statement because they made the payments; 5).
> Plaintiffs' [sic] suffered damages as they were offered a more
> expensive in house modification as an alternative could [sic] not
> afford it and then were placed in foreclosure.

Pls. Resp. Br. at 13-14.  In other words, Plaintiffs claim that, via the June 2012 TPP, Defendants

fraudulently misrepresented that they would grant Plaintiffs a HAMP modification, even though

Defendants had no intention of doing so.  Id. at 12 ("The fraud claim is based on BoA's bad faith

intent to refuse to grant a permanent HAMP modification despite announcing its intention to do

so in a written contract offer."); 13 ("BoA promised, in writing, to grant Plaintiffs' [sic] a

permanent HAMP modification if they made the TPP payments.  When BoA made this promise,

upon issuing the HAMP TPP, it had no intention of honoring its promise."); see also id. at 14

("The fraud is the refusal to grant the permanent modification, not each act of duplicity along the

way.").

9

As described above, however, Defendants did not "promise[], in writing, to grant Plaintiffs' [sic] a permanent HAMP modification if they made the TPP payments."  Id. at 13. Rather, Defendants stated, in writing, that they would grant Plaintiffs a permanent loan modification of some form; they did not promise, and indeed expressly disclaimed, that it would be a modification issued pursuant to HAMP.  And, as Plaintiffs acknowledge, Defendants did offer a permanent modification.  Therefore, Plaintiffs' fraud claim must fail.  See Anderson v. Bank of Am., N.A., No. 13-12834, 2013 WL 5770507, at *5 (E.D. Mich. Oct. 24, 2013) (dismissing fraud claim because "Defendant did, in fact, offer Plaintiff a loan modification [and i]t was Plaintiff who chose not to accept Defendant's offer").

To the extent Plaintiffs' fraud claim is based on purported oral promises by Defendants that Plaintiffs would be given a HAMP modification if they completed the required trial period payments, such a claim is barred by the statute of frauds.  See Mich. Comp. Laws § 566.132(2); see also Crown Tech. Park, 619 N.W.2d at 72; Price, 2013 WL 980278, at *2.

To the extent Plaintiffs' fraud claim is based on purported misconduct aside from the TPP — such as the "purposeful loss of files . . . to frustrate customers and delay approval; intentionally using incorrect information in calculating eligibility for HAMP modifications; requiring customers to make loan payments by phone to or through single points of contact who intentionally made themselves unavailable when payments were due and otherwise making it impossible to perform; [and] failing to process payments," First. Am. Compl. ¶ 111 — this claim does not meet the requirement under Michigan law that Defendants "made a material misrepresentation":

> The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material misrepresentation; (2) that it was false; (3) that when he made it he knew that it was false, or made recklessly, without any knowledge of its truth, and as a

10

> positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

Hi-Way Motor Co. v. Int'l Harvester Co., 247 N.W.2d 813, 816 (Mich. 1976).  In other words — other than the purported TPP — Plaintiffs fail to explain what statements were false, as opposed to simply describing bad-faith conduct.  See Fed. R. Civ. P. 8, 9(b).  Cf. Cummins v. Robinson Twp., 770 N.W.2d 421, 435 (Mich. Ct. App. 2009) ("[A]n action for fraud must be predicated upon a false statement relating to a past or existing fact.").[5]

Accordingly, the Court dismisses Plaintiffs' fraud claim.

## C.  Intentional Infliction of Emotional Distress

Plaintiffs also bring a claim for intentional infliction of emotional distress ("IIED"). Plaintiffs maintain that this claim is "independent of any HAMP TPP," but instead arises out of Defendants' purported "sophisticated program to beat down the modification applicants through a series of ruses," including "lost documents, unavailable but mandatory contact persons, constant changes in contact persons, multiple submissions and demands for the same information on many occasions, [and] contradictory advice from various contacts."  Pls. Resp. at 2.

Defendants respond that Plaintiffs' allegations do not rise to the level required to support an IIED claim.  Defs. Br. at 18-20.  Defendants argue that, as applicable to this case, Plaintiffs only allege that Defendants "misplaced documents, did not return calls, misapplied payments,

---

[5] The one exception is that Plaintiffs claim Defendants "advis[ed] customers not to make payments in order to be eligible[, and] then [used] the non-payment to default them and foreclose."  First Am. Compl. ¶ 111.  This, obviously, would constitute a statement.  However, although Plaintiffs allege that Defendants generally "employed [these] tricks, devices or schemes on the Plaintiffs," id. at ¶ 112, Plaintiffs do not provide any details about who told them not to make payments, or when they were told this.  Indeed, Plaintiffs' factual allegations contain no specific allegation or detail regarding such a statement being made expressly to them, as opposed to customers in general.  Accordingly, this part of the claim is insufficient under Federal Rule of Civil Procedure 9(b).  See Frank v. Dana Corp., 547 F.3d 564, 570 (6th Cir. 2008).

and [were] slow to issue a modification.  Even if this caused extreme stress, it is not extreme misconduct."  Defs. Reply at 6.

To state a claim for IIED under Michigan law, Plaintiffs must allege: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. Dalley v. Dykema Gossett PLLC, 788 N.W.2d 679, 694 (Mich. Ct. App. 2010).  "The threshold for showing extreme and outrageous conduct is high."  In re Estate of Bandemer, No. 293033, 2010 WL 3984653, at *3 (Mich. Ct. App. Oct. 12, 2010).  The defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Walsh v. Taylor, 689 N.W.2d 506, 517 (Mich. Ct. App. 2004) (quotation marks and citation omitted).  It is not enough that the defendant acted with an intent that is tortious or even criminal, nor that defendant acted with malice or with an intent to inflict emotional distress.  Graham v. Ford, 604 N.W.2d 713, 716 (Mich. Ct. App. 1999).  Rather, the test has been described as whether the "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"  Roberts v. Auto-Owners Ins. Co., 374 N.W.2d 905, 909 (Mich. 1985).

A defendant is not liable for IIED "where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress."  Id. (citation omitted).  Nor does liability extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."  Graham, 604 N.W.2d at 716.

Reviewing Plaintiffs' factual allegations in a light most favorable to Plaintiffs, the Court concludes that they have not met the high threshold of extreme and outrageous conduct required

12

to sustain an IIED claim.  As Defendants highlight, Plaintiffs allege that Defendants continually asked them for (and either lost or claimed to have never received) the same documentation, transferred them to various representatives, and delayed sending promised loan-modification applications.  Plaintiffs maintain that Defendants took these actions to try to force Plaintiffs into a purportedly more-expensive "in-house" modification or foreclosure, rather than a modification under HAMP.  First Am. Compl. ¶ 120.  But even if unfortunately true, and while certainly an unsavory business practice, the Court finds that this conduct is not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  Walsh, 689 N.W.2d at 517.

Numerous courts reviewing similar conduct have concluded the same.  See Maltbie v. Bank of Am., No. 12-1002, 2013 WL 6078945, at *6-7 (W.D. Mich. Nov. 19, 2013) (no claim for IIED where defendant allegedly "lur[ed] [plaintiffs] into a loan modification process that it never intended to complete and conduct[ed] a foreclosure during the loan modification review process"); Lyons v. Trott & Trott, 905 F. Supp. 2d 768, 774 (E.D. Mich. 2012) (no claim for IIED where defendant allegedly "continued to utilize false and improper criteria to frustrate and prevent the successful completion of the loan modification"); Echeverria v. BAC Home Loans Servicing, LP, 523 F. App'x 675, 677 (11th Cir. 2013) ("[T]he district court correctly held that the defendants' alleged conduct (e.g., not providing plaintiffs with correct information concerning their mortgage loan, refusing to modify that loan, losing papers and documents, and threatening foreclosure) was not 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.'" (citation omitted)); Moore v. Mortgage Electron. Registration Sys., 848 F. Supp. 2d 107, 135-136 (D.N.H. 2012) (dismissing IIED claim where plaintiffs alleged that defendants, after entering contracts with federal government to help

13

modify mortgage loans, made "either weak or nonexistent efforts toward helping [the plaintiffs] obtain a loan modification," including failing to send promised modification applications, starting foreclosure proceedings, and ignoring and refusing to respond to letters from the plaintiffs); Bazzy v. IndyMac Mortg. Servs., No. 09-13436, 2010 WL 707371, at *5 (E.D. Mich. Feb. 23, 2010) (dismissing claim where plaintiffs alleged they were subject to defendant "stringing them along, promising them a [federal-stimulus-bill] loan modification, only to go forward with the foreclosure process"); Wilson v. GMAC Mortg., LLC, No. 11-00546, 2011 WL 4101668, at *5 (D. Ariz. Sept. 14, 2011) ("[I]ntentional delay of a loan modification application for five months, foreclosure on a home for which plaintiff was in default, rejection of a loan modification application, and breaching a contractual provision, although arguably offensive, is not utterly intolerable and beyond all bounds of decency.").

Plaintiffs' cited authority does not undermine this conclusion.  Plaintiffs cite Wilson v. Kiss, 751 F. Supp. 1249 (E.D. Mich. 1990), a case in which the defendant allegedly required the plaintiff — an employee — to commit a criminal act, and, when he refused, terminated his employment.  The duress and coercion alleged in that case is not even closely analogous to the facts at issue here.  See id. at 1254 ("[W]hen an employer gains a position of authority over an employee and forces the latter to cho[o]se between performing a criminal act or losing his job, it cannot be said as a matter of law that such conduct is not extreme and outrageous.").

In its discussion, the Court in Wilson cited Margita v. Diamond Mortgage Co., 406 N.W.2d 268 (Mich. Ct. App. 1987), a case in which the court upheld the plaintiff's claim for IIED where defendant made harassing phone calls, threatened foreclosure, and mailed late charge letters to the plaintiff-homeowners for two years on a debt that was not outstanding.  But here, there is no dispute that the debt was outstanding; rather, Plaintiffs' allegations arise out of

alleged conduct surrounding a voluntary request for a loan modification. Therefore, the Court does not find <u>Margita</u> helpful to Plaintiffs' argument.

Plaintiffs also cite <u>Young v. Wells Fargo Bank, N.A.</u>, 717 F.3d 224 (1st Cir. 2013), but this case actually undermines Plaintiffs' claim. In <u>Young</u>, the plaintiff alleged that she received a TPP and made the three monthly payments, but was denied a loan modification. <u>Id.</u> at 230. In its denial letter, the defendant claimed it had not timely received all of the payments, but the plaintiff, via counsel, subsequently learned that the letter had been sent in error. <u>Id.</u> The defendant then allegedly promised to send a permanent loan modification, but, despite numerous phone calls and requests, none was forthcoming until plaintiff had her counsel re-contact the defendant. <u>Id.</u> When the plaintiff ultimately did receive a loan modification offer, the offer increased the monthly payment by nearly $300 from her trial period payments. <u>Id.</u> Even with these facts, however, the First Circuit affirmed the district court's dismissal of the IIED claim.

Plaintiffs argue that the dismissal in <u>Young</u> was due to the failure to allege the requisite intent. However, the First Circuit held that the district court's dismissal was proper based on the failure to allege the requisite intent <u>and</u> the fact that the "complaint allege[d] no facts showing . . . that the inconvenience and agitation [the plaintiff] endured rose to such a level that no reasonable person could be expected to endure it." <u>Id.</u> at 240 (brackets, quotation marks, and citations omitted). Therefore, <u>Young</u> does not support Plaintiffs' claim.

Lastly, Plaintiffs recently provided the Court with the Ninth Circuit's decision in <u>Compton v. Countrywide Fin. Corp.</u>, -- F.3d --, 2014 WL 3805529 (9th Cir. 2014). <u>See</u> Pls. Notice (Dkt. 40). But <u>Compton</u> dealt with Hawaii's unfair-and-deceptive-practices act; it did not address a claim for IIED. As described earlier, even if Defendants' conduct was wrongful under the Michigan Consumer Protection Act, a question the Court need not decide as Plaintiffs

15

dismissed this claim from an earlier complaint, it is not sufficient to show only that the defendant acted tortiously, intentionally, or even criminally. <u>Graham</u>, 604 N.W.2d at 716. Therefore, the Court concludes that Plaintiffs have failed to allege conduct rising to the high threshold required to sustain an IIED claim.

Moreover, even if Defendants' actions, if true, could rise to the level of extreme and outrageous required to support a claim for IIED, the Court finds that Plaintiffs have failed to allege the requisite causation and harm to support such a cause of action. Aside from generalized and conclusory claims of "emotional distress, humiliation, physical pain and stress related medical conditions and the related constant anxiety concerning losing their home," First. Am. Compl. ¶ 125, the only specific allegations of severe emotional distress in the First Amended Complaint concern panic attacks Mr. Sykes purportedly suffered arising out of the threats of foreclosure, <u>see</u> <u>id.</u> at ¶¶ 17-18, 36-38; <u>see also</u> Pls. Resp. Br. at 18-19 (noting that the severe emotional distress in this case is that "Plaintiff Greg Sykes suffered at least three panic attacks and was hospitalized each time while trying to withstand the forces of the Black Hole"). However, there is no dispute that Plaintiffs defaulted on their mortgage and that Defendants were entitled to "insist upon [their] legal rights" — i.e., foreclosure — "in a permissible way" — i.e., sending notices. See <u>Roberts</u>, 374 N.W.2d at 909; <u>see also</u> <u>Mabry v. Ameriquest Mortg. Co.</u>, No. 09-12154, 2010 WL 1052352, at *4 (E.D. Mich. Feb. 26, 2010) (allegation of traumatization based on prospect of foreclosure was insufficient to support a claim for emotional distress); <u>Spencer v. PNC Mortg.</u>, No. 307925, 2013 WL 951273, at *3 (Mich. Ct. App. Feb. 26, 2013) (same). Rather, the crux of Plaintiffs' IIED claim arises from the purported "black hole" Defendants created regarding Plaintiffs' loan modification application, <u>see</u> First Am. Compl. ¶¶ 120-123, and Plaintiffs' First Amended Complaint specifically alleges that Mr. Sykes was not

involved in the communications with Defendants regarding this process, see id. at ¶ 21. Therefore, because the alleged harm relates to Defendants' threats of foreclosure, rather than the loan-modification process, the Court alternatively dismisses the claim on this ground as well.

**D.  Unjust Enrichment**

Plaintiffs also brought a claim for unjust enrichment, alleging that Defendants unjustly received a benefit by "receiving government funds to provide relief and a modification, then proceeding with a foreclosure despite promising the modification for which Plaintiffs qualified and for which BoA was paid with TARP funds."  First Am. Compl. ¶ 127.  Plaintiffs asked the Court to order Defendants to "disgorge any funds received by [sic] the government from TARP for providing HAMP modifications as to Plaintiffs and their multiple applications."  Id. at ¶ 130.

At oral argument, Plaintiffs' counsel agreed on the record to the dismissal of this claim. See Hr'g Tr. at 24-25 (Dkt. 36-2).  Therefore, the Court dismisses Plaintiffs' claim for unjust enrichment.

**V.  CONCLUSION**

For the foregoing reasons, the Court grants Defendants' motion to dismiss (Dkt. 24), and dismisses Plaintiffs' First Amended Complaint with prejudice.[6]

SO ORDERED.

s:\Mark A. Goldsmith
Dated:  September 19, 2014                    MARK A. GOLDSMITH
        Detroit, Michigan                    UNITED STATES DISTRICT JUDGE

---

[6]  Because the Court dismisses Plaintiffs' claims with prejudice, the Court denies Defendants' motion to strike Plaintiffs' exhibit of supplemental authority (Dkt. 38) and motion to strike Plaintiffs' notice of supplemental authority (Dkt. 41) as moot.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 19, 2014.

s/Johnetta M. Curry-Williams
JOHNETTA M. CURRY-WILLIAMS
Case Manager
